IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LABORERS' PENSION FUND, et al., | ) |
| Plaintiffs, | ) |
| | ) No. 15-cv-09170 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| PROPERTY RECYCLING SERVICES CORP., et al., | ) |
| Defendants. | ) |

# MEMORANDUM OPINION AND ORDER

Plaintiffs Laborers' Pension Fund, Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, and Chicago Laborers' District Council Retiree Health and Welfare Fund are multiemployer benefit plans. They, along with their administrator Plaintiff Catherine Wenskus (collectively, "Funds"), brought this suit to collect unpaid contributions owed to the Funds by Defendant Property Recycling Services Corp. ("PRS"). In addition, the Funds seek to impose personal liability on Defendant Daniel Coyne, the sole officer and shareholder of PRS. The Funds assert their claims pursuant to § 515 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145, and § 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185(a). Now before the Court are the Funds' amended motion for summary judgment (Dkt. No. 125) and Coyne's motion for summary judgment (Dkt. No. 141). For the reasons stated below, the Funds' motion is granted in part and denied in part and Coyne's motion is granted.

## BACKGROUND

The following facts drawn from the parties' Local Rule 56.1 submissions are undisputed unless otherwise noted.

PRS was incorporated in October 2011 and ceased operations in 2017. (Pls.' Resp. to Def.'s Statement of Facts ("PRDSOF") ¶ 1, Dkt. No. 146.) Coyne is an officer and the sole shareholder of PRS, where his responsibilities included hiring and supervising employees and contractors, preparing and negotiating contracts with customers, and purchasing construction materials, among other things. (PRDSOF ¶ 2; Def.'s Resp. to Pls.' Statement of Facts ("DRPSOF") ¶¶ 14, 23, Dkt. No. 135.)

The parties' dispute stems from a collective bargaining agreement that PRS entered into effective June 17, 2014 ("Agreement"). (DRPSOF ¶ 6.) Under the Agreement, PRS was obligated to make contributions on behalf of certain employees for pension benefits, health and welfare benefits, retiree benefits, and a training fund. (*Id.* ¶ 8.) If it failed to do so, PRS agreed to pay liquidated damages and interest on unpaid contributions. (*Id.*) PRS was also required to submit monthly reports regarding its required payments and to submit its books and records to the Funds for audits. (*Id.* ¶¶ 8–9.)

Coyne previously ran other construction companies, including Aces Environmental Corporation, Aces Demolition Corporation, and Aces Environmental Consulting Corporation ("Aces Companies"). When PRS signed the Agreement, it also agreed to take on the debt that the Aces Companies owed to the Funds. (PRDSOF ¶ 10.) Those debts were substantial—in December 2017, the Funds obtained a judgment of $1.3 million against PRS, which had stipulated to the judgment, for debts accrued by the Aces Companies to the Funds. (DRPSOF ¶ 24.)

PRS failed to make numerous payments owed to the Funds under the Agreement in 2014, 2015, and 2016. (*Id.* ¶¶ 19, 20.) As a result, PRS owes principal contributions and dues to the

Funds in the amount of $680,913; the total due is $1,316,226, including interest and liquidated damages. (*Id.* ¶¶ 34–35.)[1]

The parties disagree on PRS's financial stability. PRS's income tax returns show a net income of $0 in 2012, $13,939 in 2013, and $24,207 in 2014. (PRDSOF ¶¶ 3, 5, 8.) But in 2015, PRS experienced a net loss of $191,669, and in 2016, a net loss of $325,513. (*Id.* ¶¶ 17, 20.) Coyne took no compensation from PRS in 2012 and was paid $24,000 in 2013, $63,600 in 2014, $62,400 in 2015, $38,400 in 2016, and nothing in 2017. (*Id.* ¶¶ 4, 6, 9, 18, 21, 24.) PRS also has a substantial (but unspecified) tax liability because it did not pay withholding taxes for its employees. (DRPSOF ¶ 33.)

The record shows that Coyne made some personal use of PRS's assets. PRS owned a 2007 Honda CR-V that Coyne occasionally used for personal purposes. (DRPSOF ¶ 26.) PRS also paid for transactions made on credit cards held by Coyne and his wife, but the parties dispute whether the cards were used for personal or corporate purposes. (*Id.* ¶ 29.) The disputed credit card transactions include approximately $1,363 in charges across four credit cards in mid-to-late 2016 and additional transactions totaling around $1,000. (PRDSOF ¶¶ 30–31.)[2]

## DISCUSSION

Under Federal Rule of Civil Procedure 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary

---

[1] Coyne disputes the amount of additional interest and liquidated damages owed but that disagreement is not material, as discussed below.

[2] The value of the disputed transactions is supported by Coyne's sworn declaration. (Def.'s Statement of Facts ("DSOF"), Ex. 1, Coyne Decl. ¶¶ 29–32, Dkt. No. 135-1.) The Funds argue that Coyne's statement "lacks foundation" and is not based on admissible evidence. But Coyne can testify regarding his business's expenditures and the Funds offer no explanation for why his assertions could not "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). In any case, the Funds offer no evidence that PRS paid for more than $2,400 of Coyne and his wife's personal expenses, which is Coyne's assertion as to the amount at issue.

3

judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A genuine dispute of material fact exists when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Inferences drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," but the nonmoving party must establish more than just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

Because both parties have moved for summary judgment, the Court adopts "a dual, Janus-like perspective" on cross motions aimed at the same claim or defense. *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015) (internal quotation marks omitted). On one motion, the Court views the facts and inferences in the light most favorable to the nonmovant, but if summary judgment is not warranted, the Court gives the unsuccessful movant "all of the favorable factual inferences that it has just given to the movant's opponent." *Id.* The Court also notes that PRS appeared in this matter through counsel early in the litigation, but its counsel withdrew in November 2017. (Dkt. No. 62.) Since then, PRS has been unrepresented and therefore unable to participate in the litigation. *See Nocula v. UGS Corp.*, 520 F.3d 719, 725 (7th Cir. 2008) ("Corporations cannot appear pro se."). By failing to respond to the Funds' motion, PRS has waived any argument against the requested relief. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). However, the Funds still must demonstrate that they are entitled to judgment. Fed. R. Civ. P. 56(a).

**I.     PRS's Liability**

In Count One, the Funds assert that PRS violated ERISA, 29 U.S.C. § 1145, and is liable for "delinquent contributions, liquidated damages, interest, audit costs, [and] reasonable attorneys' fees and costs." (First Am. Compl. ("FAC") ¶ 16, Dkt. No. 70.)[3] In Count II, the Funds assert that PRS is liable for unpaid union dues. It appears that Count II is premised on the LMRA, 29 U.S.C. § 185(a), which confers jurisdiction to federal courts to resolve disputes between employers and unions. *See Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 498 (7th Cir. 1996).

Under ERISA, plan beneficiaries may bring civil actions "[t]o recover benefits due to [them] under the terms of [the] plan, to enforce [their] rights under the terms of the plan, or to clarify [their] rights to future benefits under the terms of the plan." 29 U.S.C § 1132(a)(1)(B). ERISA provides that, when the Court enters judgment on behalf of a plan in an action brought by a fiduciary, such as the Funds, for or on behalf of a plan to enforce contribution obligations, "the court shall award the plan" the unpaid contributions, interest on the unpaid contributions, liquidated damages, reasonable attorney's fees and costs, and other damages the court deems appropriate. 29 U.S.C. § 1132(g)(2) (citing 29 U.S.C. § 1145). The Seventh Circuit has held that a plan's audit costs are also recoverable under 29 U.S.C. § 1132(g)(2). *Moriarty ex rel. Loc. Union No. 727 v. Svec*, 429 F.3d 710, 721 (7th Cir. 2005).

The Funds have provided supporting documents to show that PRS failed to make required payments to the Funds pursuant to a collective bargaining agreement. They have also provided declarations and documents demonstrating that PRS is liable for $680,912.72 in principal

---

[3] The Funds also refer to other causes of action in Count I, including the LMRA, 29 U.S.C. § 185, "federal common law," and breach of contract under state law. But their ERISA claim, standing alone, provides for all of the relief that they seek.

contributions and dues and total audits costs of $16,125.00, and that the total amount due after interest and liquidated damages is $1,316,226.24. (Pls.' Suppl. Statement of Facts ¶¶ 34–35, Dkt. No. 126.) Even Coyne, who contests his own liability in this matter, does not dispute that the Funds' evidence establishes PRS's liability for a base amount of $680,912.72 in contributions and union dues. (DRPSOF ¶ 34.) Coyne does object to the audit costs. But audit costs may be awarded under ERISA, and Coyne has no standing to object on PRS's behalf here.

As the Funds have established that PRS failed to make required contributions under the Agreement, summary judgment is entered in favor of the Funds against PRS on Counts I and II.

## II. Coyne's Liability

In Count III, the Funds assert that Coyne is liable for PRS's debts because he disregarded its corporate form. Accordingly, they contend that they may pierce the corporate veil and obtain a judgment against him for the unpaid contributions at issue in Counts I and II.

"Veil-piercing is an equitable remedy" governed by the law of the corporation's state of incorporation—here, Illinois. *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009). To pierce the veil to reach Coyne, the Funds must satisfy a two-pronged test: "(1) there must be such unity of interest and ownership that the separate personalities of [Coyne and PRS] no longer exist; and (2) circumstances must be such that adherence to the fiction of separate . . . existence would sanction a fraud or promote injustice." *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751–52 (7th Cir. 2012) (internal quotation marks omitted). Because Illinois law applies a "presumption of corporate regularity," veil-piercing is found only "reluctantly." *Melamed v. Girardi*, No. 08 C 1745, 2010 WL 2553661, at *2 (N.D. Ill. June 18, 2010) (citing *Gass v. Anna Hosp. Corp.*, 911 N.E.2d 1084, 1091 (Ill. App. Ct. 2009)). Accordingly, to prevail, the Funds "must make a substantial showing that the corporation is really

a dummy or a sham for another dominating entity." *Id.* (citing *Jacobsen v. Buffalo Rock Shooters Supply, Inc.*, 664 N.E.2d 328, 331 (Ill. App. Ct. 1996)). The Funds have the burden of proof on this claim. *See Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 776 (Ill. App. Ct. 2005).

### A. Unity of Interest

Illinois courts consider as many as eleven factors when determining whether a unity of interest and ownership exists, no one of which is dispositive. *Fontana*, 840 N.E.2d at 778. Those factors are:

(1) inadequate capitalization;

(2) failure to issue stock;

(3) failure to observe corporate formalities;

(4) nonpayment of dividends;

(5) insolvency of the debtor corporation;

(6) nonfunctioning of the other officers or directors;

(7) absence of corporate records;

(8) commingling of funds;

(9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors;

(10) failure to maintain arm's-length relationships among related entities; and

(11) whether, in fact, the corporation is a mere façade for the operation of the dominant stockholders.

*Id.* This "laundry list" of factors is unified by a core inquiry: "whether the [corporation and individual] have respected corporate formalities—respected their separateness from each other—or whether one was a sham acting at the whim of the other." *Lay-Com*, 580 F.3d at 610–11. A secondary, but important, inquiry is whether the corporation was

7

"undercapitalized"—that is, not seeded with sufficient unencumbered capital to pay its debts. *Id.* at 612.[4]

### 1. Corporate Formalities and "Separateness"

Most of the eleven factors considered by Illinois courts address corporate formalities and the fundamental "separateness" of the parties against whom veil-piercing is sought; in contrast, the factors of capitalization and solvency are more strictly financial and will be considered separately.

Coyne asserts, and the Funds do not dispute, that PRS observed corporate formalities. Specifically, PRS was incorporated in Illinois and held annual shareholder and Board of Directors meetings.[5] It also maintained corporate records, rented space for its operations, issued stock, and entered into written contracts. Although the Funds assert that Coyne acted improperly as the sole director and sole shareholder of PRS, they do not point to any specific violations of the corporate form. *Compare Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 249 F. Supp. 2d 1029, 1042 (N.D. Ill. 2003) (holding that the plaintiff failed to demonstrate unity of interest because it did not present evidence that the defendant corporation did not comply with corporate formalities or maintain adequate records, among other factors), *with Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 521 (7th Cir. 1991) (finding unity of interest where the defendant was the sole shareholder of several corporations, none of which ever held a meeting or observed other formalities).[6]

---

[4] Unencumbered capital, also known as "equity capital," is defined as "the excess of total assets over total liabilities." *Lay-Com*, 580 F.3d at 612.

[5] Coyne has produced the notes of PRS's Board of Directors meetings; not much happened at these meetings because Coyne was the only director. (Coyne's Reply in Supp. of Mot. for Summ. J., Ex. C, Board Meeting Minutes, Dkt. No. 149-1.)

[6] In their response to Coyne's statement of material facts, the Funds assert that Coyne has failed to present admissible evidence regarding PRS's corporate records. But in his declaration, Coyne made sworn statements regarding PRS's corporate records and practices. (Coyne Decl. ¶ 28.) Without offering evidence of their own, the Funds cannot establish a dispute of material fact on this issue.

A related issue is whether Coyne commingled funds with the corporation. *See Chi. Dist. Council of Carpenters Pension Fund v. Ceiling Wall Sys., Inc.*, No. 94 C 4423, 1998 WL 773993, at *9 (N.D. Ill. Oct. 30, 1998) (discussing commingling of funds as an indication of failure to observe corporate formalities). Other courts have found commingling of funds where officers "borrowed" and loaned money to and from the corporation without any documentation or authorizing resolution, *id.*; where a corporation's officers received ad hoc payments from the corporation that was not in the form of "salary, wages, dividends, or distributions," *Fontana*, 840 N.E.2d at 781; and where interrelated corporations made transfers for "no official corporate reason," *Steiner Electric Co. v. Maniscalco*, 51 N.E.3d 45, 59 (Ill. App. Ct. 2016).

No equivalent misconduct is alleged here. Instead, the Funds contend that Coyne sometimes improperly used corporate assets to pay for his personal expenses. But the total value of those transactions is less than $2,500. Even assuming that every one of those transactions was an improper personal expense, the misappropriation of a small amount of corporate money does not establish a unity of interest. *See Firstar Bank*, 249 F. Supp. 2d at 1041 (granting summary judgment because of the absence of a material fact as to unity of interest, even though the business owner used company assets to pay for his wife's cell phone and "a place to park [his] boat"). When the expenditures are small enough, the fact that a business owner has made "improper use of the [company's] assets" is not dispositive on this factor. *Id.* In any case, according to PRS's uncontroverted tax returns, Coyne took a pay cut of $14,000 between 2015 and 2016, the year when he allegedly used company money to pay for personal expenses. (DSOF, Exs. 1A–F, PRS Tax Returns, Dkt. Nos. 135-2, 135-3.) And the Funds point to no evidence of undocumented transfers or "loans" between Coyne and PRS. Even after making all reasonable

9

inferences in the Funds' favor, the Court cannot conclude that Coyne commingled his funds with those of PRS.

For the same reasons, there is no evidence that Coyne treated PRS's assets as his own. Aside from the evidence discussed above, the Funds add that Coyne made some personal use of the Honda CR-V owned by PRS. But there is no sign that he did so improperly. PRS's tax returns indicate that the vehicle was only used for business purposes ninety percent of the time, and Coyne said the same in his deposition. (PRS Tax Returns at 11; Pls.' Statement of Facts, Ex. D, Coyne Dep. 15:7–11, Dkt. No. 123-2.) The Funds also suggest that Coyne must have misappropriated the CR-V because it was not listed by PRS as an asset in its November 2020 bankruptcy petition. (PRDSOF, Ex. D, PRS Bankruptcy Pet., Dkt. No. 146.) But the Funds offer no reason to believe that the CR-V was improperly disposed of, and their speculative assertions as to the car's disposition are not enough to create a material dispute of fact. *See Borcky v. Maytag Corp.*, 248 F.3d 691, 695 (7th Cir. 2001).

Further, the evidence offered by the parties does not suggest that Coyne "diver[ted] . . . assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors." *Fontana*, 840 N.E.2d at 778. Instead, the undisputed evidence shows that Coyne took a salary of $63,600 in 2014 and gradually decreased his salary as PRS's fortunes dwindled, taking only $38,400 in 2016 and nothing in 2017. (PRDSOF ¶¶ 4, 6, 9, 18, 21, 24.) And as discussed, the potential personal expenses for which PRS paid—which amount to no more than $2,500—are not substantial enough to alter this analysis.

The Funds suggest that Coyne used PRS's assets to pay off tax liabilities owed by Aces Demolition, which Coyne would have had to pay personally if PRS had not paid them. But the Funds have presented no evidence of any such diversion of assets. In his deposition, Coyne

initially agreed that PRS paid some of Aces Demolition's "either state or federal tax liability" with its profits. (Coyne Dep. 18:9–14.) But he later clarified that "I don't think that Property Recycling paid any of Aces Demolition's withholding taxes" and "I think that everything that Property Recycling was obligated to the IRS for withholding was used for that particular entity [PRS], not paying back [debts owed by Aces Demolition]." (*Id.* 19:4–6, 19:14–17.) So, Coyne specifically denied that PRS funds were used to pay for Aces Demolition's tax withholding liabilities, which are the only tax liabilities for which the record identifies Coyne as personally responsible. (*Id.* 20:24–21:7.) In sum, the Funds have not demonstrated a disputed issue of material fact on the issue of wrongful diversion of funds.

The Funds also have not presented evidence that PRS was merely a "façade" for Coyne. PRS's tax returns indicate that the company had receipts and sales of around $500,000 in 2012, $1.1 million in 2013, $2.2 million in 2014, $2.6 million in 2015, $1.2 million in 2016, and $300,000 in 2016. (PRS Tax Returns.) PRS's largest expenses during this period, according to its tax returns, were for subcontractors, equipment rental, and other costs associated with running a company in the construction business. (*Id.*) There is no indication that PRS was simply a front for some kind of improper activity.

The Funds contend that there are unanswered questions about PRS's tax returns—for example, that its assets grew from $82,366 in 2013 to $204,042 in 2016, even as the corporation acquired substantial obligations to the Funds and other creditors. But at the summary judgment stage, it is not enough for the Funds to raise questions. "A party seeking to defeat a motion for summary judgment is required to wheel out all its artillery to defeat it." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (internal quotation marks omitted). The Funds could have developed evidence regarding the purported discrepancies in

PRS's tax returns through depositions, expert analysis, or supplemental discovery. Having failed to do so, it cannot rely on rhetorical questions to establish a material issue of fact.

There are two factors that do weigh against Coyne, if only slightly.[7] First, PRS never distributed any dividends, although the Funds have not suggested that this is unusual for a startup company of PRS's nature. And second, the interactions between PRS and Coyne were not at arm's length, although that dynamic is typical for an owner-operated company. Nonetheless, as a whole, the analysis of corporate formalities and separateness overwhelmingly weighs against veil-piercing.

### 2. Undercapitalization and Solvency

Next, the Court considers the undercapitalization and solvency factors. Although different businesses might require very different amounts of equity, it "is clear . . . that there must be ***some*** equity. Shareholders are generally expected to invest ***some*** money, that is, if they want the benefit of limited liability." *Lay-Com*, 580 F.3d at 612; *see also Fontana*, 840 N.E.2d at 779 ("It is inequitable to allow shareholders to set up a flimsy organization just to escape personal liability."). On the other hand, "[u]ndercapitalization is rarely if ever the sole factor in a decision to pierce the corporate veil," and has been described as "best regarded simply as a factor helpful in identifying a corporation as a pure shell." *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 961 (7th Cir. 1999). And "a court will find a corporation to be undercapitalized only when it has so little money that it could not and did not actually operate its nominal business as its own." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (internal quotation marks omitted).

---

[7] The factor regarding the nonfunctioning of other officers or directors is not applicable, because Coyne was PRS's only officer and director.

Coyne does not dispute that he invested no money of his own into PRS. Instead, he explains that PRS acquired certain assets from one of the Aces Companies and used "bootstrapping"—relying on revenues from sales to pay expenses, instead of relying on initial equity—to fund its business. He also offers evidence that PRS was able to operate on its own, at least for a few years; indeed, the corporation realized a modest net income in 2013 and 2014. But ultimately, aside from revenues, the only startup capital of PRS identified in the record are assets shifted from Aces Demolition that were encumbered by debt. (Coyne Dep. 10:15–22.) Coyne reports that he personally signed the note and incurred a personal debt for that equipment. (*Id.*) This evidence indicates that PRS was undercapitalized.

The Funds further contend that they are entitled to an adverse inference regarding PRS's undercapitalization because Coyne failed to produce certain documents to them in. It is unclear that such an inference would make any difference here, however, because the Funds have already come forward with uncontroverted evidence of PRS's undercapitalization. But in any event, the Funds are not entitled to the inference. They note that Coyne did not provide documents regarding debts of the Aces Companies acquired by PRS, records of payments made on those debts, records on payments made on equipment, or other lawsuits and bills that PRS paid. Such documents pertain to PRS's incorporation and the early periods of its operation. Whether a negative inference can be drawn depends on whether Coyne has provided "a legitimate excuse for the failure." *Ceiling Wall Sys.*, 1998 WL 773993, at *9. Here, Coyne responds that the Funds' initial discovery requests sought only information related to the "relevant time period" for benefits contributions, which began in June 17, 2014. Coyne explains that he produced all of the relevant documents in his possession (over 1,000 documents) for this period but that the documents referenced by the Funds relate to PRS's early operations prior to the period for which the Funds

sought discovery. Although the Funds submitted a second request for production of documents to PRS (not Coyne) in August 2018, Coyne notes that PRS had been out of business for a year and a half when that request was made. The Court accepts this as a legitimate explanation, especially given that the Funds hold the burden of proof and the Funds failed to bring any discovery motions to attempt to compel production of the information or otherwise to explore the topic during discovery. So, no inference is made for the Funds on the basis of the purported discovery failure.

The insolvency factor likewise leans towards the Funds. The evidence indicates that PRS always operated on thin margins—relying on quick payments from customers to pay for already-incurred expenses. As a result, when its expenses increased, it was forced to cease operations. Coyne does not dispute this point.

### 3. Balancing of Factors

There is no dispute of material fact regarding whether Coyne respected corporate formalities and operated his business in good faith. All of the evidence on that point suggests that Coyne is guilty only of running a failing company. There is, however, evidence that would allow a jury to find that Coyne undercapitalized PRS. Thus, the question is whether undercapitalization—making all inferences in the Funds' favor—would allow a rational factfinder to conclude that a unity of interest existed between Coyne and PRS. Here, the evidence that the Funds have presented and the disputes of material fact do not allow for such a finding. Although PRS may have been undercapitalized, it was not a "pure shell" for Coyne's activities. *Browning-Ferris*, 195 F.3d at 961. And it did, throughout its existence, "operate its nominal business as its own"—it continued to hire subcontractors, take on bids, and earn revenues even as it collapsed under the weight of its debt.

To prevail on the "unity of interest" prong, the Funds were required to make "a substantial showing" that PRS "was in fact really a dummy or sham" for Coyne. *Wachovia Sec.*, 674 F.3d at 752 (internal quotation marks and citation omitted). The Funds seek to proceed to trial based solely on their showing as to undercapitalization without an accompanying showing of "fraud," "illegality," or inequity, which is generally required. *Id.* at 751. To allow their claims to survive summary judgment would be to ignore the "presumption of corporate regularity" to which Coyne and PRS are entitled. *Melamed*, 2010 WL 2553661, at *2. In sum, the Funds have not come forward with enough evidence or disputes of material facts to support the conclusion that "the separate personalities of [PRS] and [Coyne] no longer exist." *Lay-Com*, 580 F.3d at 610.

### B. Fraud or Injustice

In the alternative, the Court considers whether a rational factfinder could conclude that failing to pierce the corporate veil would sanction a fraud or promote injustice. "[T]he grounds for piercing a corporate veil are fraud or kindred forms of wrongful conduct." *On Command Video Corp. v. Roti*, 705 F.3d 267, 269 (7th Cir. 2013). Such "kindred forms" include unfair enrichment; "allow[ing] a parent corporation, that had created a subsidiary's liabilities and was the cause of the subsidiary's inability to meet them, to escape responsibility;" favoring former partners by allowing them to escape obligations; and "uphold[ing] a corporate arrangement to keep assets in a liability-free corporation while placing liabilities in an asset-free corporation." *Id.* at 269–70 (internal quotation marks omitted). In other words, there must be "some 'wrong' beyond a creditor's inability to collect." *Pepper Source*, 941 F.2d at 524.

The Funds have done little to address what evidence supports a conclusion of fraud or injustice. They note that if Coyne had not drawn a salary, he could have done more to satisfy PRS's debts. But the Funds have made no showing that Coyne's salary was excessive or

15

inappropriate; indeed, Coyne **decreased** the salary he took as PRS's condition worsened. *See Roti*, 705 F.3d at 275 (holding that the corporate veil could not be pierced based on officer's receipt of salary without some indication that the salary was excessive). The Funds also note that the true victims of the unpaid debts are laborers and their dependents whose benefits are imperiled by the failure of employers like PRS to pay contributions. But without some showing that fraud underlies PRS's failure to pay, this is akin to a failure to pay a creditor and does not rise to the level of fraud or injustice required for veil-piercing.

The Funds also have not come forward with evidence that Coyne stripped PRS's assets to shield them from creditors. Instead, the evidence at most suggests that Coyne tried to balance assets and debts in a single company but was ultimately unable to keep up. And the Funds have not offered evidence that Coyne failed to disclose information about PRS's financial position. If anything, the record suggests that the Funds may have known that they would face difficulties collecting from PRS. They knew that Coyne had previously operated the Aces Companies, which owed unpaid debts to the Funds, and accordingly required PRS to assume the Aces Companies' debt to them as a condition of employing unionized workers whose unions participated in the Funds. They also were aware that PRS's corporate status might limit the assets against which they could collect if PRS defaulted. *See Tower Invs., LLC v. 111 E. Chestnut Consultants, Inc.*, 864 N.E.2d 927, 941 (Ill. App. Ct. 2007) (noting that "the party seeking relief in a contract case is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of the limited liability associated with the corporate business form" (internal quotation marks and citation omitted)).

In sum, the Funds have the burden to establish facts, or material disputes as to facts, that would allow them potentially to prevail at trial. They have not done so. Summary judgment is

16

thus appropriately granted in favor of Coyne. Because summary judgment is granted for Coyne and against the Funds on this basis, the Court does not reach other non-dispositive issues that the parties have raised (for example, whether the Funds would be entitled to liquidated damages against Coyne if the corporate veil were pierced or whether Coyne is entitled to strike pieces of the Funds' evidence due to discovery violations).

## CONCLUSION

For the reasons discussed above, Coyne's motion for summary judgment (Dkt. No. 141) is granted. The Funds' amended motion for summary judgment (Dkt. No. 125) is granted as to PRS (Counts I and II) but denied as to Coyne (Count III). By October 25, 2021, the Funds shall file a supplemental statement detailing their current calculation of interest and attorney's fees and costs, as well as a proposed judgment order against PRS reflecting the final amount to which they are entitled.

ENTERED:

Dated: October 18, 2021

Andrea R. Wood
United States District Judge